[No. 60163-6-I.    Division One.    February 9, 2009.]

KENNETH C. BURTON, *as Personal Representative, Appellant,*
v. TWIN COMMANDER AIRCRAFT, LLC, *Respondent.*

608

*Thomas W. Bingham* and *Jeffrey C. Jones* (of *Krutch, Lindell, Bingham, Jones & Petrie, PS*) (*Gene Hagood* of *Hagood & Neumann, LLP*, of counsel), for appellant.

*Clark R. Nichols* and *Mary Pedersen Gaston* (of *Perkins Coie, LLP*) and *Michael J. Teter* (of *Georgetown Law Center*), for respondent.

¶1 SCHINDLER, C.J. — In May 2004, a Twin Commander Model 690C twin engine airplane crashed, killing all seven people aboard. The personal representative of the decedents' estates, Kenneth C. Burton, filed wrongful death actions against Twin Commander Aircraft, LLC, as the current type certificate holder of the Twin Commander Model 690C aircraft. The General Aviation Revitalization Act of 1994 (GARA)[1] bars civil actions against "the manufacturer of the aircraft" or the manufacturer of "any new component, system, or other part of the aircraft" 18 years after delivery to the first purchaser or the date of completion of the replacement or addition. GARA § 2(a). However, GARA provides a new 18-year time limitation period for any new component, system, or other part that replaced or was added to the aircraft and allegedly caused the accident, known as the "rolling provision." GARA § 2(a)(2). There are also several exceptions to the statute of repose, including where the manufacturer knowingly misrepresented, or concealed, or withheld required information from the Federal Aviation Administration (FAA) that is material and relevant to the operation of the aircraft and is causally related to the accident.

¶2 In the wrongful death lawsuits against Twin Commander, Burton alleged that the "Alert Service Bulletin Upper Rudder Structural Inspection" (SB 235) that was issued by Twin Commander in April 2003 was the defective part that caused the crash. Burton also alleged that in obtaining approval of the service bulletin, Twin Commander knowingly misrepresented, or concealed, or withheld information concerning the structural integrity of the rudder system to the FAA. Twin Commander filed a motion for

---

[1] Pub. L. No. 103-298, 108 Stat. 1552 (1994), *amended by* Pub. L. 105-102, 111 Stat. 2204, 2215 (1997), *codified at* 49 U.S.C. § 40101 note.

summary judgment dismissal, arguing that as a matter of law, SB 235 was not a new "part" that triggered the rolling provision under GARA. Twin Commander also argued there was no evidence that it knowingly misrepresented, or concealed, or withheld material information from the FAA. The trial court granted the motion for summary judgment and dismissed the wrongful death lawsuits against Twin Commander.

¶3 We conclude the court did not err in ruling that SB 235 is not a new component, system, or part of the aircraft under the rolling provision of GARA. However, because the record does not permit a reasoned determination of whether Twin Commander is the "manufacturer of the aircraft" under GARA, and there are material issues of fact about whether Twin Commander knowingly misrepresented, or concealed, or withheld material information from the FAA, we reverse and remand for further proceedings.

## FACTS

¶4 Gulfstream American Corporation was the original manufacturer of the Model 690A, 690B, and 690C aircraft. In 1979, the FAA issued a type certificate authorizing Gulfstream to manufacture the Model 690C dual engine turboprop airplane. By issuing the type certificate, the FAA approved the aircraft design and certified that the design complied with safety standards and met FAA regulations.[2]

¶5 In 1981, Gulfstream sold a Model 690C dual engine turboprop airplane, serial number 11678, to a Venezuelan purchaser. In 2004, the airplane was owned by an agency of the Mexican government, Procuraduria General de la Republica (PGR).

¶6 In 1989, Twin Commander Aircraft acquired the type certificate from Gulfstream for the Model 690A, 690B, and 690C aircraft. Even though the type certificate authorizes Twin Commander to manufacture the aircraft, there is no

---

[2] *See generally* 14 C.F.R. §§ 21.11-21.55.

dispute that Twin Commander did not continue to manufacture the aircraft.[3] As the type certificate holder, Twin Commander is required to provide ongoing support to the aircraft and report information to the FAA that could result in a risk to flight safety.[4]

¶7 In November 2002, the rudder system of a Model 690B failed while in flight and the plane made an emergency landing in Texas. The rear structure of the airplane was damaged, and the fiberglass rudder cap and upper rudder rib were missing. In March 2003, another Model 690B aircraft crashed in Georgia after experiencing an in-flight breakup when the rudder cap separated from the rudder.

¶8 In response to these two accidents, Twin Commander sought and obtained FAA approval on April 18, 2003 to issue SB 235 for Twin Commander Models 685, 690, 690A, 690B, 690C, 690D, 695, 695A, and 695B. SB 235 required a one-time close visual inspection of the rudder cap, top rudder rib, and forward rudder spar "[w]ithin 25 hours or 90 days, whichever comes first." The rudder caps for the Model 690A and Model 690B aircraft are a fiberglass composite. The rudder cap for the Model 690C is aluminum.

¶9 SB 235 describes the two accidents in 2002 and 2003 that involved the Twin Commander Model 690B as the "Reason for Publication." SB 235 also states that field reports indicated unusual wear on the composite rudder tips.

¶10 On May 2, 2004, the Twin Commander Model 690C aircraft owned by PGR crashed near Aqua Caliente, Mexico. All seven PGR employees were killed. According to the report by the Mexican authorities, aviation technicians inspected the aircraft in compliance with SB 235 in July and again in October 2003. The accident investigation by the Mexican government determined that the rudder came

---

[3] *See id.* §§ 21.3, 21.6(a), 21.45, 21.50, 21.7, 25.1529.

[4] *See id.* §§ 21.3, 21.7, 21.50, 25.1529.

loose in flight, causing loss of control of the aircraft. The report concludes that SB 235 was inadequate.

¶11 On April 29, 2005, the personal representative for the estates of the seven crash victims, Kenneth C. Burton, filed wrongful death lawsuits against Twin Commander.[5] Burton asserted that "[t]he rudder tip and rudder assembly separated from the aircraft causing the pilot . . . to lose control" of the aircraft. Burton claimed that SB 235 was the defective product that caused the accident. Burton alleged causes of action for product liability, negligence, failure to disclose and concealing information from the FAA, strict products liability, and failure to warn. In the amended complaint, Burton deleted the failure to warn claim and specifically asserted that "all [of] these causes of action relate solely and only to Service Bulletin 235. Plaintiffs do not now allege any cause of action based on defective design, manufacture, marketing, assembly or otherwise of the aircraft in question nor do Plaintiffs state a claim for failure to warn." The amended complaint also sets forth factual allegations to support the claim that Twin Commander "knowingly misrepresented to the FAA or concealed or withheld from the FAA required information" regarding problems with the rudder system that were causally related to the 2004 crash. In addition, Burton alleged that in obtaining certification from the FAA for the Model 690, the testing for rudder problems was inadequate and the rudder problems were not disclosed.

¶12 Twin Commander filed a motion for summary judgment dismissal based on the federal statute of repose under GARA. GARA bars actions against the manufacturer of the aircraft if the accident occurred 18 years after delivery to the first purchaser. GARA § 2(a). GARA also contains a "rolling provision" that starts the statute of repose anew with respect to "any new component, system, subassembly, or other part . . . which replaced . . . , or which was added to, the aircraft, and which is allegedly to have caused such

---

[5] The wrongful death lawsuits were consolidated for pretrial proceedings.

death, injury, or damage . . ." of the accident. GARA § 2(a)(2). The GARA statute of repose does not apply to certain exceptions, including those claims related to the manufacturer's knowing misrepresentation to the FAA of material information related to the cause of the accident. GARA § 2(b). Twin Commander argued that the rolling provision was not implicated by SB 235 and there was no evidence that it knowingly misrepresented material information to the FAA.

¶13 In opposition, Burton argued that as a matter of law the rolling provision applied because SB 235 was a part of the maintenance manual, which is a "part" of the aircraft. Burton also submitted expert testimony to argue that there were material issues of fact as to whether the knowing misrepresentation, or concealment, or withholding exception under GARA applied.

¶14 The trial court granted Twin Commander's motion for summary judgment on the grounds that "there *are no* material issues of fact in dispute as to the applicability of the GARA statute of repose and as to whether Plaintiffs' claims fall under one of the statutory exceptions to the GARA statute of repose . . . ." Burton appeals.

## ANALYSIS

¶15 Burton argues that as a matter of law the rolling provision of GARA applies because SB 235 is a new component, system, or part that amended the aircraft maintenance manual, which is "part" of the aircraft. In the alternative, Burton argues there are material issues of fact about whether Twin Commander is "the manufacturer of the aircraft" under GARA and whether Twin Commander knowingly misrepresented, or concealed, or withheld material information about the rudder system defects for Model 690C from the FAA.

*Standard of Review*

¶16 The court reviews summary judgment de novo. *Mountain Park Homeowners Ass'n v. Tydings*, 125 Wn.2d

337, 341, 883 P.2d 1383 (1994). The moving party under CR 56 bears the initial burden to demonstrate the absence of any genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Young v. Key Pharms., Inc.*, 112 Wn.2d 216, 225, 770 P.2d 182 (1989). A defendant requesting summary judgment must do more than simply deny liability. *Hash v. Children's Orthopedic Hosp. & Med. Ctr.*, 110 Wn.2d 912, 757 P.2d 507 (1988). "At the very least, to support a motion for summary judgment the moving party is required to set out its version of the facts and allege that there is no genuine issue as to the facts as set out." *Id.* at 916. As noted in *White v. Kent Medical Center, Inc.*, 61 Wn. App. 163, 170-71, 810 P.2d 4 (1991), "It is difficult to prove a negative, and in some circumstances the only way that the moving party will be able to show that there is no material issue of fact is by way of reply to the responding party's citations to the record." Once the moving party meets its initial burden, the burden then shifts to the nonmoving party to set forth specific facts showing a genuine issue of material fact exists for trial.[6] The court must consider the evidence and the reasonable inferences therefrom in a light most favorable to the nonmoving party.

*GARA*

¶17 Congress enacted GARA in 1994 to limit "the long tail of liability" imposed on manufacturers of general aviation aircraft. *Lyon v. Agusta S.P.A.*, 252 F.3d 1078, 1084 (9th Cir. 2001). "It is apparent that Congress was deeply concerned about the enormous product liability costs that our tort system had imposed upon manufacturers of general aviation aircraft." *Id.* GARA "creates an explicit statutory right not to stand trial." *Estate of Kennedy v. Bell Helicopter Textron, Inc.*, 283 F.3d 1107, 1110 (9th Cir. 2002). GARA is a mandatory statute of repose that

---

[6] We reject Burton's argument that Twin Commander did not meet its initial burden on summary judgment on the question of whether the misrepresentation exception under GARA applied.

bars lawsuits against the manufacturer of the aircraft or the manufacturer of any new component, system, or other part of the aircraft from accidents that occurred more than 18 years after the initial transfer of the aircraft. GARA §§ 2(a), 3(3). GARA also "supersedes any State law to the extent that such law permits a civil action . . . ." *Id.* § 2(d).

¶18 GARA provides in pertinent part:

SEC. 2. TIME LIMITATIONS ON CIVIL ACTIONS AGAINST AIRCRAFT MANUFACTURERS.

(a) IN GENERAL.—Except as provided in subsection (b), no civil action for damages for death or injury to persons or damage to property arising out of an accident involving a general aviation aircraft may be brought against the manufacturer of the aircraft or the manufacturer of any new component, system, subassembly, or other part of the aircraft, in its capacity as a manufacturer if the accident occurred—

(1) after the applicable limitation period beginning on—

(A) the date of delivery of the aircraft to its first purchaser or lessee, if delivered directly from the manufacturer; or

(B) the date of first delivery of the aircraft to a person engaged in the business of selling or leasing such aircraft . . . .

. . . .

SEC. 3. OTHER DEFINITIONS.

For purposes of this Act—

. . . .

(3) the term "limitation period" means 18 years with respect to general aviation aircraft and the components, systems, subassemblies, and other parts of such aircraft . . . .

*Id.* §§ 2(a)(1), 3(3).

¶19 GARA contains a "rolling provision" that restarts the 18-year limitation period against the manufacturer of any new or replacement part. The rolling provision provides:

(2) with respect to any new component, system, subassembly, or other part which replaced another component, system,

subassembly, or other part originally in, or which was added to, the aircraft, and which is alleged to have caused such death, injury, or damage, after the applicable limitation period beginning on the date of completion of the replacement or addition.

*Id.* § 2(a)(2).

¶20 GARA also sets forth four exceptions where the 18-year statute of repose does not apply. One exception provides that the statute of repose does not apply if the manufacturer knowingly misrepresented or concealed or withheld from the FAA material information that was causally related to the accident.

(b) EXCEPTIONS.—Subsection (a) does not apply—

(1) if the claimant pleads with specificity the facts necessary to prove, and proves, that the manufacturer with respect to a type certificate or airworthiness certificate for, or obligations with respect to continuing airworthiness of, an aircraft or a component, system, subassembly, or other part of an aircraft knowingly misrepresented to the Federal Aviation Administration, or concealed or withheld from the Federal Aviation Administration, required information that is material and relevant to the performance or the maintenance or operation of such aircraft, or the component, system, subassembly, or other part, that is causally related to the harm which the claimant allegedly suffered.

*Id.* § 2(b)(1).

¶21 Here, there is no dispute that the May 2004 accident occurred more than 18 years after Gulfstream first delivered the aircraft in 1981. There is also no dispute that Twin Commander acquired the type certificate from Gulfstream in 1989 and made no changes to the rudder system for the Model 690 series.

*GARA § 2(a)(2): New Part*

¶22 Burton claims that as a matter of law, the rolling provision of GARA applies to Twin Commander as the manufacturer of a new component, system, or part. Burton contends SB 235 is a new component, system, or part that

amends the maintenance manual, which is "part" of the aircraft.

¶23 Burton relies on *Caldwell v. Enstrom Helicopter Corp.*, 230 F.3d 1155 (9th Cir. 2000), to argue that the maintenance manual is "part" of the aircraft. In *Caldwell*, because the revised flight manual did not include a warning that the last two gallons of fuel could not be used, the helicopter ran out of fuel and crashed. The fuel system was designed so the last two gallons of gas could not be used. The flight manual has been revised within the 18-year statute of repose. The plaintiffs alleged that the revised flight manual lacked any warning about the two gallons of unusable fuel.

¶24 The Ninth Circuit held that a revised helicopter flight manual could be considered a "new part" or a "defective system" of the aircraft under the rolling provision of GARA because the revised flight manual was an integral part of the helicopter that allegedly caused the accident. *Id.* at 1157-58. The court concluded that "if Defendant substantively altered, or deleted, a warning about the fuel system from the manual within the last 18 years, and it is alleged that the revision or omission is the proximate cause of the accident, then GARA does not bar the action." *Id.* at 1158. In reaching this conclusion, the court cited and relied on the federal regulations that require the flight manual to be on board the aircraft, that the flight manual must contain the " 'information that is necessary for safe operation because of design, operating, or handling characteristics,' " and that a flight manual is not a general instructional guide "but instead is detailed and particular to the aircraft to which it pertains." *Id.* at 1157 (quoting 14 C.F.R. § 27.1581(a)(2)). The court in *Caldwell* also cited federal regulations that specifically require the flight manual to contain information about a gas tank and usable fuel supply. *Id.* (citing 14 C.F.R. § 27.1585(e)).

¶25 There is no dispute that Twin Commander issued SB 235 in April 2003, 13 months before the accident in May 2004. Burton contends that because SB 235 is a revision to the maintenance manual, like a flight manual it is "part" of the aircraft. We agree with the reasoning in *Colgan Air, Inc. v. Raytheon Aircraft Co.*, 507 F.3d 270, 276 (4th Cir. 2007), that a maintenance manual "is not sufficiently similar to a flight manual" and is not a "part" of the aircraft for purposes of the rolling provision under GARA.

¶26 Unlike a flight manual that is used by the pilot and is necessary to operate the aircraft, a maintenance manual is used by the mechanic and "outline[s] procedures for the troubleshooting and repair of the aircraft." *Emory v. McDonnell Douglas Corp.*, 148 F.3d 347, 351 (4th Cir. 1998). Unlike the federal regulations that require the flight manual to be on board the aircraft, Burton cites no requirement that the maintenance manual must be on board.[7] And unlike a flight manual, a maintenance manual as well as a service bulletin are used on and apply to different aircraft models.[8]

¶27 Burton cites to 14 C.F.R. § 43.13(a), which provides that

[e]ach person performing maintenance, alteration, or preventative maintenance on an aircraft, engine, propeller, or appliance shall use the methods, techniques, and practices prescribed in the current manufacturer's maintenance manual or Instructions for Continued Airworthiness prepared by its manufacturer, *or other methods, techniques, and practices acceptable to the [FAA].*[9]

---

[7] Burton's citation to the federal regulations relates only to the requirement that the manufacturer provide a maintenance manual to the owner of the aircraft. 14 C.F.R. § 21.50(b) ("The holder of . . . the type certificate or supplemental type certificate for an aircraft . . . shall furnish at least one set of complete Instructions for Continued Airworthiness, to the owner of each type aircraft . . . upon its delivery.").

[8] Here, there is no dispute that SB 235 applied to a number of different models including Models 690A, 690B, 690C, 690D, 695, 695A, and 695B.

[9] (Emphasis added.)

But as the court noted in *Colgan*, "Recognizing that a maintenance manual is an acceptable means of compliance, it is not the sole means by which an operator may obtain airworthiness." *Colgan*, 507 F.3d at 277.

¶28 Lastly, issuing a service bulletin is not a separate undertaking. There is no dispute that Twin Commander had an ongoing duty to provide information related to the safety of the aircraft.[10]

¶29 Moreover, while Burton asserts SB 235 was the defective product that caused the crash, Burton's allegations support a claim for a failure to warn, not a defect in the maintenance manual.[11] Unlike the plaintiffs in *Caldwell*, Burton does not allege the aircraft was in "good working order." *Caldwell*, 230 F.3d at 1156. Burton alleges that the airplane's rudder tip and rudder assembly separated from the aircraft causing the pilot to lose control and SB 235 did not adequately address or correct the defect in the rudder system. As the Ninth Circuit later explained in *Lyon*, a revision to a flight manual is different from a failure to warn. "What we alluded to there [(in *Caldwell*)], we reify here: a failure to warn is decidedly not the same as replacing a component part with a new one." *Lyon*, 252 F.3d at 1088.

¶30 In *Alter v. Bell Helicopter Textron, Inc.*, 944 F. Supp. 531, 538, 541 (S.D. Tex. 1996), the court concluded that the "manufacturers' maintenance and repair manuals are not a 'separate' product or component upon which plaintiffs may base a claim to avoid a repose statute." The *Alter* court rejected the plaintiff's attempt to avoid the GARA time bar by arguing that the manual was defective, concluding that

---

[10] In contract, an airworthiness directive is a legally enforceable rule that the FAA issues when it determines a potentially unsafe condition exists. According to Burton's expert witness, Donald E. Sommer, an airworthiness certificate is a mandatory alteration.

[11] In the original complaint, Burton alleged, "Twin Commander negligently and carelessly failed to provide adequate notice to owners and operators of Twin Commander aircraft of the problems with the rudder assemblies on said aircraft, and the correct steps to detect, correct, and avoid an in-flight problem with said rudder assemblies."

"the suit for a failure of the manuals to correct a design flaw is precluded by the statute of repose that bars a suit for the design flaw." *Id.* at 540.

¶31 In *Robinson v. Hartzell Propeller Inc.*, 326 F. Supp. 2d 631 (E.D. Pa. 2004), plaintiffs sought to avoid the GARA statute of repose by alleging that a recently issued maintenance manual failed to adequately address problems with an aircraft over 18 years old. The plaintiffs' expert testified that "the inspection procedures in the overhaul manual were 'defective' because they 'were inadequate to detect the pitting on the surface of the blade that led to the fatigue failure and blade separation.'" *Id.* at 662. The court concluded that the plaintiffs' true claim was for a failure to warn of the defective blade and the manual did not cause the plane crash.

> "To hold that [the defendant] should be liable because its manuals issued within the period of repose did not provide an adequate means of correcting the design flaw of the critical component, would be to *circumvent the statute of repose by providing a back door to sue for the design flaw—ostensibly not for the design flaw itself, but for the failure of the manuals to adequately correct the flaw. The result would be the evisceration of the statute of repose.*"

*Id.* at 661 (emphasis added) (alteration in original) (quoting *Alter*, 944 F. Supp. at 539-40).

¶32 We reject Burton's argument that as a matter of law, the rolling provision under GARA applies to SB 235, and affirm the trial court.

## The Manufacturer of the Aircraft

¶33 If Twin Commander is not the manufacturer of a new part for purposes of the rolling provision, Burton contends that Twin Commander is not "the manufacturer of the aircraft," entitled to protection under GARA. It is undisputed that Twin Commander is the type certificate

holder for Model 690C. Citing *Burroughs v. Precision Airmotive Corp.*, 78 Cal. App. 4th 681, 93 Cal. Rptr. 2d 124 (2000), and *Mason v. Schweizer Aircraft Corp.*, 653 N.W.2d 543 (Iowa 2002), Twin Commander asserts that as the type certificate holder, it is the manufacturer under GARA.[12] Burton argues that Twin Commander has not met its burden of showing that it is the "manufacturer of the aircraft" under GARA.

¶34 It is undisputed that GARA does not define "manufacturer." GARA defines "general aviation aircraft" as

> any aircraft for which a type certificate or an airworthiness certificate has been issued by the Administrator of the Federal Aviation Administration, which, at the time such certificate was originally issued, had a maximum seating capacity of fewer than 20 passengers, and which was not, at the time of the accident, engaged in scheduled passenger-carrying operations as defined under regulations in effect under Part A of subtitle VII of title 49, United States Code [49 U.S.C. §§ 40101-40129], at the time of the accident.

GARA § 2(c).

¶35 Under federal rules of statutory construction, where a term is not defined in the statute, courts "look first to the statutory language and then to the legislative history . . . ." *Blum v. Stenson*, 465 U.S. 886, 896, 104 S. Ct. 1541, 79 L. Ed. 2d 891 (1984). Twin Commander does not engage in an analysis of the statutory language, legislative history, or pertinent federal regulations to determine whether a type certificate holder that does not actually manufacture general aviation aircraft is the "manufacturer of the aircraft" under GARA.

¶36 *Burroughs* and *Mason* are also not helpful in making this determination. In *Burroughs* and *Mason*, the type

---

[12] At the beginning of the hearing on the motion for summary judgment, the court granted Twin Commander's motion to file an overlength reply brief but allowed Burton to file a surreply. Burton first raised the issue of whether Twin Commander was the manufacturer of aircraft under GARA in the surreply brief. Even though the court told Twin Commander, "If there's some compelling issue on which Twin Commander feels to weigh in, you can seek permission to do that very specifically with respect to one issue, . . ." Twin Commander did not do so.

certificate holder was clearly the successor manufacturer. In both cases, the type certificate holder began manufacturing the product line after acquiring the type certificate. *Burroughs*, 78 Cal. App. 4th at 684-85, 692 ("Although Precision did not actually manufacture the particular carburetor in this case, it is a manufacturer of general aviation aircraft parts, including carburetors." (footnote omitted)); *Mason*, 653 N.W.2d at 545 ("Although Schweizer has never manufactured a model 269A helicopter, it has made 269C and 269D series helicopters under the type certificate purchased from McDonnell Douglas.").

¶37 Unlike in *Burroughs* and *Mason*, Twin Commander has not established it is a successor manufacturer. Twin Commander states that it "has never manufactured any aircraft"—including the Model 690 series and the record is unclear to what extent Twin Commander assumed the assets and liabilities of the original manufacturer, Gulfstream.[13] Because the record is inadequate to determine whether Twin Commander is the "manufacturer of the aircraft" entitled to protection under GARA, we must remand.[14]

*GARA § 2(b): Knowing Misrepresentation, or Concealment, or Withholding Exception*

■ ¶38 Even if Twin Commander is the manufacturer of the aircraft for purposes of GARA, Burton contends there are material issues of fact about whether Twin Commander knowingly misrepresented, or concealed, or withheld mate-

---

[13] Twin Commander also cites an unpublished case, *Hasler Aviation, LLC v. Aircenter, Inc.*, 2007 WL 2263171, 2007 U.S. Dist. LEXIS 56856 (E.D. Tenn.), in which a district court concluded that Twin Commander is a manufacturer under GARA. But the *Hasler* court did not analyze whether Congress intended to extend GARA protection to type certificate holders that do not manufacture aircraft. Burton's reliance on another unpublished case, *Michaud v. Fairchild Aircraft Inc.*, 2001 WL 34083885, 2001 Del. Super. LEXIS 482, is also unpersuasive. Unlike in *Michaud*, Twin Commander did not acquire the type certificate during bankruptcy proceedings and was given no disclaimer of liability.

[14] Consequently, we need not consider Burton's argument related to Twin Commander's status under the FAA's Delegation Option Authority.

rial information from the FAA concerning structural problems or defects with the Model 690C rudder system.

¶39 The statute of repose under GARA does not apply if the plaintiff pleads with specificity the facts necessary to prove that the manufacturer with respect to the type certificate knowingly misrepresented, or concealed, or withheld required material and relevant information to the performance, maintenance, or operation of the aircraft that is causally related to the accident. GARA § 2(b)(1). To establish the knowing misrepresentation, or concealment, or withholding exception, the plaintiff must show (1) knowing misrepresentation, or concealment, or withholding of material and relevant information (2) that the manufacturer is required to give the FAA and (3) that is causally related to the accident. *Robinson*, 326 F. Supp. 2d at 647.

¶40 Burton contends that in obtaining approval of SB 235, Twin Commander knew but failed to disclose or withheld from the FAA material and relevant information about recurring structural problems with the rudder assembly and the lower horizontal stabilizer rib.

¶41 On April 17, 2003, Twin Commander submitted a "Statement of Compliance with the Federal Aviation Regulations" for SB 235. In the Statement of Compliance, Twin Commander's Designated Engineering Representative certified that SB 235 complied with the federal regulations. On April 18, 2003, the FAA approved issuance of SB 235.

¶42 SB 235 requires a one-time close visual inspection of the rudder tip, top rudder rib, and forward rudder spar for damage. If damage is observed, SB 235 recommends replacement of the rudder tip. SB 235 identifies the "Reason for Publication" as the two accidents that occurred in 2002 and 2003.

2.3 In two recent events involving Twin Commander 690B aircraft the fiberglass composite rudder tip appears to have departed the aircraft in flight. In one event, the aircraft landed safely; in the second event, the aircraft was lost. Neither rudder cap has been located, nor has a determination been made as to the cause of either event.

2.4 Reports from the field indicate that some composite rudder tips have sustained unusual wear of the leading edge (erosion, pitting and cracking) which could result in an overall weakening of the attendant structural assembly. Reports from the field also indicate evidence of cracking in welds and fasteners holes of some aluminum rudder tips. In addition, Twin Commander has received reports of some aluminum rudder tips. In addition, Twin Commander has received reports of fiberglass or aluminum repairs affecting the balancing of the rudder being accomplished without the required adjustment to the mass balance in accordance with the aircraft Maintenance Manual paragraph on Control Surface Balancing.

¶43 Citing two Twin Commander e-mails dated April 4 and April 21, 2003, Burton argues that as in *Butler v. Bell Helicopter Textron, Inc.*, 109 Cal. App. 4th 1073, 135 Cal. Rptr. 2d 762 (2003), and *Robinson*, there are material issues of fact about whether Twin Commander knowingly misrepresented, or concealed, or withheld required relevant and material information from the FAA.

¶44 In *Butler*, a civilian helicopter crashed, killing four passengers and injuring two others. The plaintiffs alleged the helicopter crash was caused by the failure of the tail rotor yoke. There was evidence that the manufacturer withheld information from the FAA about military helicopter accidents that were caused by the failure of identical tail rotor yokes. Citing the federal regulations, the court held that the manufacturer had a duty to " 'report any failure, malfunction, or defect in any product . . .' " and did not do so. *Butler*, 109 Cal. App. 4th at 1083 (quoting 14 C.F.R. § 21.3(a)).

¶45 In *Robinson*, the plaintiffs alleged that the manufacturer, Hartzell, concealed a design defect in a propeller and misrepresented the cause of the crash. *Robinson*, 326 F. Supp. 2d at 636. The court denied Hartzell's motion for summary judgment because the plaintiffs presented evidence showing Hartzell told the FAA that stress test results were " 'approximately the allowable value,' " but a graph Hartzell gave the FAA showed that the result ex-

ceeded the allowable value. *Id.* at 638. The court rejected Hartzell's argument that because it had previously provided the FAA with the graph, "the FAA would have been able to make this determination itself" because the type certificate holder has a duty to report any failures, defects, or malfunctions of the aircraft to the FAA. *Id.* at 649.

¶46 As in *Butler* and *Robinson*, Burton contends the April 4 and April 21 e-mails from Jeff Cousins, Twin Commander's vice president/general manager, create material issues of fact about whether the misrepresentation or concealment exception under GARA applies. We agree.

¶47 According to Burton's expert, Robert Donham, the failure of the rudder system resulted in flutter instability causing the May 2004 crash. Donham points to statements made in the April 4 and April 21 e-mails as evidence that Twin Commander misrepresented or concealed the extent of the structural problems with the rudder system and withheld critical information from the FAA about the rudder system.

¶48 Donham contends the April 4 e-mail shows Twin Commander knew but did not disclose that the structural damage in the 1992 accident was "identical" to the 2002 and 2003 accidents cited in SB 235. According to Donham, the seriousness of the problem would have been evident if Twin Commander had disclosed that the accidents were related. The April 4 e-mail provides in pertinent part:

> [A]ll the breakups we have records of and the 1992 accident of the Casper Air Service 840 (metal rudder cap) going into Denver *has tearing of the rudder identical to the two recent incidents*. BUT the cap for the aircraft WAS recovered and is in one piece. The failure was below the cap and rib. The vertical spar failed in a twisting force 2 inches above the upper rudder hinge. The significance of this is that the rudder has the same appearance of the two current ones. The other significant fact is

that extensive analysis was done on the Casper rudder and it failed well above design.[15]

Donham also points out that the April 4 e-mail shows Twin Commander knew the structural failure of the rudder system was not simply related to the rudder cap. The e-mail states that "we have no evidence to point to the cap as the primary cause of the problem." Donham also points to statements in the April 4 e-mail that the structural failure was "2 inches above the upper rudder hinge" and "[t]he failure was below the cap and rib" to show Twin Commander knew the problem was not limited to the rudder cap.

¶49 Another expert, William R. Twa, testified that Twin Commander had an obligation to disclose to the FAA the information about the 1992 crash in the context of the 2002 and 2003 accidents in order to conduct the necessary tests and inspections. Although there is no dispute that Twin Commander reported the 1992 Denver accident at the time, there is no evidence that Twin Commander did so in relation to the 2002 and 2003 accidents. Under 14 C.F.R. § 21.3, Twin Commander had a duty to report "any failure, malfunction, or defect" with the rudder system. As in *Robinson*, even if Twin Commander previously reported the 1992 accident, there is no evidence that Twin Commander informed the FAA that the "tearing of the rudder" in 1992 was identical to the recent accidents in 2002 and 2003.[16]

¶50 Donham also cites the April 21 e-mail as further support for the conclusion that Twin Commander knew but did not disclose the full extent of the problem with the rudder system. The April 21 e-mail discusses reports from service centers that were received after issuing SB 235:

Last week was enlightening for us all as reports came in from Service Centers[.] We not only have 22 rubber horn caps on order, we have numerous reports of defective heating elements,

---

[15] (Emphasis added.)

[16] Under 14 C.F.R. § 21.3, there is an exception for reposing failures, malfunctions, or defects previously reported to the FAA.

*cracked lower horizontal stabil[izer] ribs,* cracked upper rudder ribs, and a defective forward rudder spar. It has become apparent that this part of the aircraft deserves more attention during inspections and ongoing maintenance.[17]

In Donham's opinion, the reports of cracked lower horizontal stabilizer ribs presents evidence of structural rudder system problems that result in flutter instability. "I have again reviewed the documentation Twin Commander provided to the FAA for approval of Service Bulletin 235. Twin Commander did not advise the FAA that its Service Centers were reporting numerous cracked lower horizontal [stabilizer] ribs." Donham further states that this information shows that "while recognizing that on-going maintenance was required for this problem, Twin Commander knowingly misrepresented and withheld this information from the FAA, submitting Alert Service Bulletin 235 that did not require any recurrent inspection, testing or repair, only a one time visual inspection." Viewing the evidence in the light most favorable to the nonmoving party, we conclude there are material issues of fact about whether Twin Commander knowingly misrepresented, or concealed, or withheld relevant and material information from the FAA in obtaining approval of SB 235.[18]

---

[17] (Emphasis added.)

[18] On the other hand, we reject Burton's argument that the failure to conduct proper tests of the Model 690C when obtaining certification from the FAA or the failure to investigate previous crashes creates a material issue of fact. In *Rickert v. Mitsubishi Heavy Industries, Ltd.*, 923 F. Supp. 1453 (D. Wyo. 1996), the plaintiff claimed Mitsubishi concealed the fact that design defects made its planes likely to crash in icy conditions. The court ruled that evidence that the wrong tests were performed, that the planes had a higher accident rate than similar planes, and that some employees believed the problem was due to design defects was inadequate to defeat summary judgment. *Rickert*, 923 F. Supp. at 1457-62. The court rejected the argument that the plaintiff's expert's "belief that the [aircraft] fails to meet regulatory criteria" or "differences of opinion and mistakes amount to misrepresentations." *Rickert*, 923 F. Supp. at 1458-59. Here, there is no dispute that each of the accidents were reported to the FAA. And as in *Rickert*, disagreement over what tests should have been performed or the cause of the crash does not establish knowing misrepresentation. *Rickert*, 923 F. Supp. at 1461.

¶51 We affirm in part, reverse in part, and remand for further proceedings.

Cox and LAU, JJ., concur.

Review granted at 166 Wn.2d 1039 (2009).